Good morning, your honors. If it pleases the court and counsel, my name is Simon Lean. I'm joined at counsel table by John Kucera. We are both with the firm Boies Schiller Flexner, and we are representing the appellant, Mr. Letifov, on a pro bono basis today. This case turns on the facts surrounding Mr. Letifov's persecution in Russia. Those facts are not disputed. The IJ found that Mr. Letifov was credible, and the BIA did not doubt that finding. Nonetheless, first the immigration judge, and then later the BIA panel, failed to consider a number of those uncontroverted facts when they determined that Mr. Letifov was not eligible for asylum. And so I plan today to discuss that determination, and subject to any rebuttal, and I would like to keep two minutes for rebuttal, if that's all right. I'll submit the withholding of removal and the Convention Against Torture issues on the briefs. So before you get into the lack of clarity in our case law on the standard of review that we apply to the board's determination that a particular set of facts constitutes persecution, and I think in your brief you said that substantial evidence. I guess I invite you to sort of elaborate on what you think it is that we're doing when we said your brief, and I assume that you're referring to Mr. Letifov there. Well, I understand it's not you personally, but like it's still the brief for your case. Yes, of course. Right, so my understanding of the substantial evidence is that if there was no substantial basis for the IJ to make the reverse, the BIA, and remand. But so is that, I mean, and do we think of that, I mean, so the substantial evidence, right, is statute tells us, you know, no, you know, we can only reverse for substantial evidence if, for lack of substantial evidence, if the record is such that, you know, any reasonable fact finder would be compelled to reach a contrary conclusion. So we look at the facts, and as the reasonable fact finder be compelled to conclude that this constitutes persecution, and if the answer to that is no, then you lose. Is that right? Yes. Okay. And you're taking that position despite the fact that there are cases in this court that say it's Genova. Sorry. The review is Genova. Well, so my, the, our legal issues are reviewed Genova, and the application of the facts to the case law of being a legal issue would be reviewed Genova. So then why are we looking at a substantial evidence in this case, which is, which is about the application of facts, of the law, legal standard to the law, to the facts? So I think I may have misspoke earlier, and I apologize for that. So the substantial evidence question goes to the determination of the facts. Okay, but as you began here, there really aren't any facts of dispute. That is correct. So there is no substantial evidence for review here. That is correct. You are not clear. I apologize. So if I, so then just take me through what, what, what is it that we're, we're asking here? We're asking whether the, the IJ, and then after the IJ, the BIA panel, correctly adjudicated under the, the Ninth Circuit case law, whether the facts that, again, are not in dispute, constitute persecution. And that is a, what sort of question? That's a Genova question. That's a... Yes, sorry. Okay. Okay, but, but, okay, then I, we have an awful lot of cases that say it's, it's a factual question we review for substantial evidence. So what do we do with those cases? So I, I think that, that there are cases that go both ways on this, and I think that the panel should follow the cases that suggest that it's a Genova review. And why? Because it's a question of, it's a pure question of law, whether the, the facts under, under prior case law constitute persecution. Well, is it really, I mean, it's sort of, isn't it kind of bound up in, I mean, one, you know, there's two, two, two questions, two, here are two, two reasons it might not be, and I'll let you, you know, address them. One is, you know, the board doesn't specifically say, you know, we doubt some of these facts. Doesn't necessarily mean that they have accepted, you know, every detail of the facts that were presented by the petitioner, and that we must therefore assume them to be true. And number two, it's sort of, you know, bound up in what is ultimately kind of a discretionary judgment on the part of the board. That sort of, it's not really a, it's maybe less clear than some legal questions would be, and then has a, has an element of the board's exercise of its discretion. So why, why don't those two considerations counsel in favor of a more deferential review of the board than de novo? So taking those in reverse order, the court owes the IJ and the BIA a significant deference. When it comes to the determination of the facts, the deference is not owed to, to the IJ and the BIA when it comes to applying those facts to controlling the case on the Ninth Circuit. And in a situation in which the, the IJ and the BIA afterwards was unclear about whether they found certain facts, or whether they found the situations, you might encounter a situation where there would be some ambiguity about whether the IJ's determination, the BIA's determination was a factual determination or was an application of those facts to the law. That is not the situation in which we find ourselves here. The IJ was very clear that the IJ found Mr. Ledevov to be, to be credible. But I mean, if you're saying de novo, I mean, review, persecution, it would make sense if the BIA made a sweeping ruling. So for example, in this case, a BIA said, well, if anyone's beaten with a water bottle, that could never be a persecution because that's just a water bottle. It's not a baseball bat or anything like that. But here it seemed like it was more specific to the facts. And you may well be right that actually on the facts here, you know, it seemed like he was beaten pretty much with a water bottle. And that aspect seems like that should be substantial evidence review because it was more tailored to the facts, not a more sweeping legal presumption. So I think that the BIA's determination was that anyone who falls into the following set of facts, and then the facts that the IJ had found and the BIA agreed with, is that those set of facts do not correct your honor that the BIA did not make a sweeping proclamation about specifically being beaten with a water bottle. The proclamation was just as sweeping, just it was not limited to the water bottle fact. It was limited to the fairly limited but broader than water bottle set of facts that the IJ and this all matters in this case and maybe you want to get to the facts of this case. I just the standard matter and through that you can tell us why you think that your client should in fact be determined to have been persecuted. And whether and if it turns out that your position is that even on a substantial evidence review you would still prevail, then the standard doesn't matter, right? That is correct, your honor. And it is our position that under either standard of the IJ and the BIA. So you want to tell us why because you're running short on time. I would love to, thank you. And so let me quickly run through some of the facts that are in the record. I think we know the facts in the record. Why don't you tell us why it's persecution based on our case law. Sure. So first I think that the the IJ and the BIA failed to consider a number of the facts and that failure in and of itself is sufficient to reverse the BIA's determination. They failed to consider quite a large number of facts that were elucidated in Mr. Ledefov's credible fear interview, including that he was stopped by the police almost every day on the basis of his religion, that there's a unit in Dagestan called the that imprison and kill people on the basis of Mr. Ledefov's religion and ethnicity, and that they also they engaged in that same behavior towards people who complain about the persecution of people with Mr. Ledefov's religion and ethnicity. And so as an initial matter, I think the the IJ's failure and the BIA's. That all goes to future persecution, is that what you're arguing? No, Your Honor. Okay. I think that some of those instances, some of that goes to future persecution, some of it goes to past persecution. For example, that Mr. Ledefov was stopped by the police almost every day on the basis of his religion. So to answer your prior question, Your Honor, the BIA relied on two cases in the IJ's determination. The first is, and I apologize if I'm getting this incorrect, GU, it is spelled G-U in the event that I am mispronouncing that. The NYSERC in that case found that there was no persecution, past persecution, because the applicant was detained and beaten on only one occasion. The beating left temporary red marks but required no medical treatment. His suffered no adverse employment consequences. That detention lasted several days. In almost every respect, the treatment to which Mr. Ledefov was subjected differs and was more extreme than the treatment that Mr. GU was subject to. It did require medical treatment. The BIA says it didn't. He went to the doctor. The doctor wrote a note. There's no specific evidence of what treatment he got, although one would think that if you went to the doctor you got treated, but the BIA's agency was going on the premise that he didn't, in fact, need medical treatment. So that is accurate, Your Honor, both in that the record contains two relevant facts, sir. One, that Mr. Ledefov believed that he needed to seek medical treatment, and the record reflects that he went to the hospital and received the certificate, sort of describing the extent of his injuries. The certificate does not, nor does the record any other way, reflect what actual treatment Mr. Ledefov received. I would point out, however, that one of the issues in GOW, not to be confused with GU, that the Ninth Circuit found probative of whether persecution had occurred was whether the applicant had believed medical treatment necessary. It turned not on what treatment was actually received, but whether the applicant went out to seek medical treatment. Another way in which this case very significantly differs from GU is that the authorities closed Mr. Ledefov's mosque so that Mr. Ledefov was no longer able to practice his religion, which was the probative and, I think, decisive factor in a different GOW case in the Ninth Circuit. That's GOW recessions 897 F 3rd 1208. Additionally, here we have a loss of employment. Is there anything in the record about the reason for the loss of employment? So there is a little bit in the record, more in the record than the IJ or the BIA discuss. The record reflects that Mr. Ledefov called the HR contact at his employment, and the HR contact was somewhat confused about what had happened. And Mr. Ledefov sort of explained what had occurred, and the HR person said at that point, well, there's nothing that we can do for you. There's nothing that we can do for you, and that is not a direct quote. I can find the direct quote. But he didn't explain it. So we don't know if he was fired as part of the government's campaign against him, or just because of the detention, he hadn't shown up for work. We don't know why, do we? It is true that we do not know whether he was fired. It's not a bad inference. The reason was he didn't show up for work, they would have said that. Right, and I think that it's also a fair inference from the fact that there's nothing that we can do for you. Showing up a couple of days late for work is not the sort of thing, you can never be employed again. This red light is blinking. Anyone has, it seems there are no further questions, we'll give you two minutes for rebuttal. I appreciate it. And Ms. Melnick. May it please the court, Karen Melnick for the United States. If I could start where the court began with the standard of review, or the level review. Elias Zacharias is, as far as I know, still good law, such that the review is for substantial evidence, or whether the record compels. Elias Zacharias has to do with it. It's a substantial evidence review. Of what? Of the board's, of the agency's determination of whether or not there's past persecution. You think Elias Zacharias says that? I believe it stands for the proposition that agency review is for substantial evidence, and along with... Of facts. Correct. That's the question. Is this a fact, or is this an application of fact to law, which under more recent Supreme Court law, is de novo review? Well, even under Cardozo-Fonseca, you know, the persecution evaluation is done on a case-by-case basis. That's the question. Right, and so it's more a question that is left to the agency's purview. Are you aware that there are recent opinions in this court, including Fon, but others which have pointed out that we have, there is at least a substantial question about whether or not this is de novo review, or substantial evidence review, and there's an opposition and dissent by Judge Collins. Have you read any of these? I'm familiar with them generally, Your Honor. However, this was not something that counsel briefed to the court, and as far as I know, the Supreme Court has still not, has rejected efforts to change this level, or this standard of review. No, actually, it just did the opposite in a Supreme Court opinion, where it said that application of law to facts is quite possibly de novo review, or in that instance was de novo review. So you seem not to be familiar with the lay of the land at this point. It's not an easy question, but it's not, you're portraying that there is established Supreme Court law on this, and there isn't. Well, we would submit that the current state of the law, as of today, although there's been attempts to make a change. All right, go ahead. You don't seem prepared to help us with what's a hard problem. What impact does the standard of review question we've been discussing have, if any, here, where it seems like it's kind of right in the middle, though, between two precedents of ours. You know, it's, I think, the facts are more egregious than I mean, does, what impact does standard review have? How should we approach this? Well, yes, I would also mention, I mean, I have read the court's recent cases where, in the end, it's, the court has come to the conclusion that, regardless of the standard of review, that the outcome would be the same. And my response would be that that's the case here. What the, you know, the extent, you know, this is a case that falls in the gray area. You know, the respondent's not arguing that 17 days' detention is insignificant, or that the harm he received, you know, that he didn't receive any harm, because he did. But it's the totality of the circumstances that the agency is required to look at. And the board here considered the totality of the circumstances, looked at the court's relevant case law, which has already been cited, GU, there's also another GAL decision, and used those as sort of guideposts to make their determination as to whether or not this rose to the extreme level of past persecution. In fact, as the court probably would know, this case was remanded once for the board to reconsider, among other things, the 17 days' detention. And both times, the board concluded that it did not rise to the level of past persecution. Because you have to look at not just the 17 days. There are instances in the court's case law where someone's been detained for a much shorter period of time, but the level of harm is so much more severe. Between petitioner's testimony saying he was hit with these water bottles on and off for over a period of hour, his statement attached to his asylum application says 40 minutes. So you've got 40 minutes, approximately, giving him the detention. But there are other factors. There are factors such as he was not under any continuing obligation once he was released. There's no prohibition that he not make public speeches, or sign anything to say that he shouldn't believe in his religion or practice his religion, which this court has found to be very significant in its other cases. What about counsel's point that it's not like Guo where they said you're not allowed. In Guo, I think they said you're not allowed to go to the church anymore. Here, they didn't say that, but they closed the mosque, so they prevented him from continuing to worship. Why isn't that comparable? Well, the facts that counsel articulated that he felt the board didn't consider are ones that were not raised to the board. He was represented at the board level, and there was no mention in his brief to the board or to this court regarding the religious aspect. In fact, he seemed to abandon it altogether. He speaks of in his board brief about this being an imputed political opinion. He doesn't check the box of political opinion in his asylum application, but he seemed to somewhat abandon his religious claims because he doesn't speak of them at all in his board brief. The fact that the board wasn't focused on it is not surprising. I thought his whole theory was that this came about because of his opposition to the closure of the mosque. You don't think that put the board on notice that there was a religious aspect? Well, he doesn't mention it at all to the board. I mean, and he was represented by counsel at the board. He wasn't before the immigration judge, but he was represented before the board, and there's no mention of that, so we would suggest that that aspect of it is really not exhausted. So again, with respect to the sort of totality of the circumstances that the agency and the court has to consider, there were no reporting requirements. As the court mentioned, there was this loss of employment, but we don't know why. I mean, he was a machinist. Obviously, he wasn't at work for this period of time, but he said that in his testimony that he, and that's at AR 156, that he didn't report back to work after he was released, that he called in at some point later, we don't know how much later, and was informed that he no longer had the job. Again, we don't know why. Again, he also doesn't argue, you know, economic persecution or that it was a factor. He doesn't mention that in his board brief as well. His focus before the board, and hence the board's focus, was, you know, the 17 days and the harm, the physical harm, and as the court also pointed out, it's, you know, it's his burn to show that he suffered this extreme level of persecution, and while, you know, physical, you know, the treatment and the level of abuse is not the only factor, it's a factor, and we don't know what, if any, treatment he required. The certificate from the hospital says he sustained bruising, hematomas, which, you know, obviously is consistent with his testimony in terms of what happened to him, but beyond that, we don't know. So, the fact that there was no sort of ongoing obligation or hindrance to his ability to... True, he was told that he couldn't leave for six months. Isn't that a hindrance? Well, he might have been told that, but it certainly didn't affect his ability to go. The record shows that he left on his own past... Defied the instructions, but the instructions were don't leave for six months. Again, he wasn't required to sign anything, perhaps this... And he was, he was checked up on, according to him, right? On one, on one occasion each, authorities spoke to his uncle and his brother about his whereabouts. We don't know much more than that. We, there's no evidence that they were threatened or that they were harmed or that... Whether there was restrictions on him, the fact that he was checked up on indicates that there were restrictions, he just didn't follow them. Well, beyond the travel registry that he speaks of, which again, didn't seem to hinder him, we don't know of any, there are no other restrictions that he referred to. He specifically says he wasn't required to sign anything. He says he was, there were no quote like accusatory papers, so that goes into more well-founded if he's going back, but he's not facing charges, according to him. His wife and children are still living in Russia and they were not, there's no evidence that they were contacted regarding his whereabouts. So I think that, again, this is not, I don't think we would be before your honors if this was a very clear cut case. It perhaps falls in a gray area, but the standard of review, we would argue, is that they've not identified evidence that compels reversal. Reasonable minds can differ. Your honors may disagree, but that's... But then you are relying directly on your position as to what the standard of review is, and you're not relying on the notion that if we were doing Genova review, we would come to the same conclusion. Are you or not? No, I would also. In the alternative, I would, and I think your honors would come to the same decision as the board twice came to, and that although there are indeed some troubling aspects, again, it's the length of detention that I think sticks out perhaps more than the others, that all the factors taken together in this case don't rise to the level. Can I ask you about the, one more question about the standard of review? I mean, you've noted correctly that Petitioner in his brief says it's substantial evidence. Do you think we're bound by that? Is the standard of review the sort of thing that's subject to waiver? You know, I would submit that it's our position, it's the government's position that it's a, that that's the current law of the land in this province. Right, no, I understand you. I get that you think it's the right answer, right? So, I mean, maybe this is a question better directed to somebody else who didn't think that was the right answer, but I guess I'm just saying, is the court bound by the party's agreement on the standard of review? You know, sort of apart from, obviously, if the thing they agree on is correct, then that's what we should do, but if we thought it wasn't correct, do we have to accept it? I mean, I, to be honest with the court, I hadn't thought that far ahead. Fair enough. But I would, that's, yeah, more speculative than I was prepared to go, but I think that's probably a good course to, if the parties are on alignment on that regard, then yes. Okay, thank you. I just want to briefly, counsel doesn't really, or petitioner doesn't really address well-founded fear in his brief. He simply relies on the, you know, presumes that they've demonstrated past persecution, and then says, and therefore, we have the presumption, they have the presumption of a well-founded fear. We, of course, would disagree with that and would refer back to the fact that, again, there was no, you know, reporting requirements, that there doesn't seem to be any, we have no more evidence other than them reaching out to the uncle and the brother that there's any continued interest in him, and the fact that he traveled freely on his own passport. And I know that they submit on CAD, unless the court has further questions, I see my time is also running down. Does the government have a view on whether a referral to the circuit mediation program would be a productive exercise here? You know, I'm certainly not opposed to it if that's, if the court is interested in that. You know, I'm sure the court's familiar with the judicial administrative closure. You know, it's something that the petitioner has not reached out to me to ask for, and that's, you know, pretty case by case. So, I mean, it's not something I would be opposed to, but it's not something that was, it's been brought to my attention by petitioner. Understood. Okay. Thank you very much. Thank you, Your Honor. Thank you. Mr. Lien. First, Your Honor, I'd like to briefly point out that we do say in the brief that the standard for questions of law is de novo. I believe the panel suggested, or some members of the panel may have suggested, that this case falls in between some of the cases that the parties have cited. And I would submit that the persecution in this case is more extreme than the persecution in the Gao cases that we cite in support of our position. Right? So, in Gao 1, we've got two different instances of persecution. One detention of 1.5 days, which, of course, is significantly less than 17. One that's 15 days, which is also less than 15. And in Gao, unlike in our case, we don't have the authorities stealing money. We don't have the loss of a job. We don't have the authorities going to our brother and our uncle to try to find us, presumably, to engage in more punitive behavior. I would also like to point out that... In one or both of the Gao cases, was there reporting requirements? He had to report to them? Yes. I believe in one of the Gao cases, he had to report on, if I recall correctly, a weekly... In the other, there was no such requirement? I would need to confirm. I believe that is true. Here, of course, we were prohibited from traveling for six months. Petitioner very quickly fled due to fear of continued persecution. But in the two Gao cases, the petitioners there were forced to renounce their religious beliefs, which has this 1984 feel to it. So, that appears to be a key distinction. So, it is true that that happened in both of those cases. It is true that that is severe. I would submit that it is more severe to prevent someone from practicing their religion by closing down their house of worship than it is to force them to sign a document that is not enforced upon in the way that it was... He's renouncing of his religion or his inability to enforce it by closing the mosque. Can you address Judge Miller's question about mediation? Yes. I think we may be on the same page here in that that is something that we are not necessarily opposed to, but it's not something that we've discussed with Appelli. But we would be happy to have a conversation with Appelli. And if that happened, would you do that or would the original lawyer do it? We would do that. You would do it? Yes. Okay. Thank you. Are there further questions? No, I think I have. Thank you, counsel. We thank both counsel for their arguments in this case. The case is submitted and we are adjourned. This court for this session stands adjourned.
judges: BERZON, MILLER, LEE